PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1465

———————

In re:  JEVIC HOLDING CORP., et al.,

Debtors

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
on behalf of the bankruptcy estates
of Jevic Holding Corp., et al.

v.

CIT GROUP/BUSINESS CREDIT INC.,
in its capacity as Agent;
SUN CAPITAL PARTNERS, INC.;
SUN CAPITAL PARTNERS IV, LP;
SUN CAPITAL PARTNERS MANAGEMENT IV, LLC

CASIMIR CZYZEWSKI; MELVIN L. MYERS;
JEFFREY OEHLERS; ARTHUR E. PERIGARD
and DANIEL C. RICHARDS,
on behalf of themselves and all others similarly situated,

Appellants

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 13-cv-00104 & 1-13-cv-00105)
District Judge: Honorable Sue L. Robinson

———

Argued January 14, 2015

Before: HARDIMAN, SCIRICA and BARRY,
<u>Circuit Judges</u>

(Filed: May 21, 2015)

Jack A. Raisner, Esq. (Argued)
Rene S. Roupinian, Esq.
Outten & Golden
3 Park Avenue, 29th Floor
New York, NY 10016

Christopher D. Loizides, Esq.
Loizides, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
    *Attorneys for Appellants*

Domenic E. Pacitti, Esq.
Linda Richenderfer, Esq.
Klehr Harrison Harvey Branzburg
919 Market Street, Suite 1000
Wilmington, DE 19801
    *Attorneys for Appellee Debtors*

Robert J. Feinstein, Esq.
Pachulski Stang Ziehl & Jones
780 Third Avenue, 36th Floor
New York, NY 10017

James E. O'Neill III, Esq.
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801
     *Attorneys for Appellee Official Committee of*
     *Unsecured Creditors*

Christopher Landau, Esq. (Argued)
James P. Gillespie, Esq.
Jason R. Parish, Esq.
Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, DC 20005

Danielle R. Sassoon, Esq.
Kirkland & Ellis
601 Lexington Avenue
New York, NY 10022

Curtis S. Miller, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

*Attorneys for Appellee Sun Capital Partners IV, LP,*
*Sun Capital Partners, Inc., Sun Capital  Partners*
*Management IV, LLC.*

Tyler P. Brown, Esq.
Shannon E. Daily, Esq.
Hunton & Williams
951 East Byrd Street
13th Floor, East Tower, Riverfront Plaza
Richmond, VA 23219

Richard P. Norton, Esq.
Hunton & Williams
200 Park Avenue, 52nd Floor
New York, NY 10166
          *Attorneys for Appellee CIT Group Business Credit Inc.*

Ramona D. Elliott, Esq.
P. Matthew Sutko, Esq.
Wendy L. Cox, Esq. (Argued)
United States Department of Justice
441 G Street, N.W., Suite 6150
Washington, DC 20530
          *Attorneys for Amicus Curiae*

———————

OPINION OF THE COURT

———————

HARDIMAN, Circuit Judge

This appeal raises a novel question of bankruptcy law:
may a case arising under Chapter 11 ever be resolved in a

"structured dismissal" that deviates from the Bankruptcy Code's priority system? We hold that, in a rare case, it may.

I

A

Jevic Transportation, Inc. was a trucking company headquartered in New Jersey. In 2006, after Jevic's business began to decline, a subsidiary of the private equity firm Sun Capital Partners acquired the company in a leveraged buyout financed by a group of lenders led by CIT Group. The buyout entailed the extension of an $85 million revolving credit facility by CIT to Jevic, which Jevic could access as long as it maintained at least $5 million in assets and collateral. The company continued to struggle in the two years that followed, however, and had to reach a forbearance agreement with CIT—which included a $2 million guarantee by Sun—to prevent CIT from foreclosing on the assets securing the loans. By May 2008, with the company's performance stagnant and the expiration of the forbearance agreement looming, Jevic's board of directors authorized a bankruptcy filing. The company ceased substantially all of its operations, and its employees received notice of their impending terminations on May 19, 2008.

The next day, Jevic filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware. At that point, Jevic owed about $53 million to its first-priority senior secured creditors (CIT and Sun) and over $20 million to its tax and general unsecured creditors. In June 2008, an Official Committee of Unsecured Creditors (Committee) was appointed to represent the unsecured creditors.

5

This appeal stems from two lawsuits that were filed in the Bankruptcy Court during those proceedings. First, a group of Jevic's terminated truck drivers (Drivers) filed a class action against Jevic and Sun alleging violations of federal and state Worker Adjustment and Retraining Notification (WARN) Acts, under which Jevic was required to provide 60 days' written notice to its employees before laying them off. *See* 29 U.S.C. § 2102; N.J. Stat. Ann. § 34:21-2. Meanwhile, the Committee brought a fraudulent conveyance action against CIT and Sun on the estate's behalf, alleging that Sun, with CIT's assistance, "acquired Jevic with virtually none of its own money based on baseless projections of almost immediate growth and increasing profitability." App. 770 (Second Am. Compl. ¶ 1). The Committee claimed that the ill-advised leveraged buyout had hastened Jevic's bankruptcy by saddling it with debts that it couldn't service and described Jevic's demise as "the foreseeable end of a reckless course of action in which Sun and CIT bore no risk but all other constituents did." App. 794 (Second Am. Compl. ¶ 128).

Almost three years after the Committee sued CIT and Sun for fraudulent conveyance, the Bankruptcy Court granted in part and denied in part CIT's motion to dismiss the case. The Court held that the Committee had adequately pleaded claims of fraudulent transfer and preferential transfer under 11 U.S.C. §§ 548 and 547. Noting the "great potential for abuse" in leveraged buyouts, the Court concluded that the Committee had sufficiently alleged that CIT had played a critical role in facilitating a series of transactions that recklessly reduced Jevic's equity, increased its debt, and shifted the risk of loss to its other creditors. *In re Jevic Holding Corp.*, 2011 WL 4345204, at *10 (Bankr. D. Del. Sept. 15, 2011) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)). The Court dismissed

without prejudice the Committee's claims for fraudulent transfer under 11 U.S.C. § 544, for equitable subordination of CIT's claims against the estate, and for aiding and abetting Jevic's officers and directors in breaching their fiduciary duties, because the Committee's allegations in support of these claims were too sparse and vague.

In March 2012, representatives of all the major players—the Committee, CIT, Sun, the Drivers, and what was left of Jevic—convened to negotiate a settlement of the Committee's fraudulent conveyance suit. By that time, Jevic's only remaining assets were $1.7 million in cash (which was subject to Sun's lien) and the action against CIT and Sun. All of Jevic's tangible assets had been liquidated to repay the lender group led by CIT. According to testimony in the Bankruptcy Court, the Committee determined that a settlement ensuring "a modest distribution to unsecured creditors" was desirable in light of "the risk and the [re]wards of litigation, including the prospect of waiting for perhaps many years before a litigation against Sun and CIT could be resolved" and the lack of estate funds sufficient to finance that litigation. App. 1275.

In the end, the Committee, Jevic, CIT, and Sun reached a settlement agreement that accomplished four things. First, those parties would exchange releases of their claims against each other and the fraudulent conveyance action would be dismissed with prejudice. Second, CIT would pay $2 million into an account earmarked to pay Jevic's and the Committee's legal fees and other administrative expenses. Third, Sun would assign its lien on Jevic's remaining $1.7 million to a trust, which would pay tax and administrative creditors first and then the general unsecured creditors on a

pro rata basis.[1] Lastly, Jevic's Chapter 11 case would be dismissed. The parties' settlement thus contemplated a structured dismissal, a disposition that winds up the bankruptcy with certain conditions attached instead of simply dismissing the case and restoring the status quo ante. *See In re Strategic Labor, Inc.*, 467 B.R. 11, 17 n.10 (Bankr. D. Mass. 2012) ("Unlike the old-fashioned one sentence dismissal orders—'this case is hereby dismissed'—structured dismissal orders often include some or all of the following additional provisions: 'releases (some more limited than others), protocols for reconciling and paying claims, "gifting" of funds to unsecured creditors[, etc.]'" (citation omitted)).

There was just one problem with the settlement: it left out the Drivers, even though they had an uncontested WARN Act claim against Jevic.[2] The Drivers never got the chance to present a damages case in the Bankruptcy Court, but they estimate their claim to have been worth $12,400,000, of

---

[1] This component of the agreement originally would have paid all $1.7 million to the general unsecured creditors, but the United States Trustee, certain priority tax creditors, and the Drivers objected. The general unsecured creditors ultimately received almost four percent of their claims under the settlement.

[2] Although Sun was eventually granted summary judgment in the WARN Act litigation because it did not qualify as an employer of the Drivers, *In re Jevic Holding Corp.*, 492 B.R. 416, 425 (Bankr. D. Del. 2013), the Bankruptcy Court entered summary judgment against Jevic because it had "undisputed[ly]" violated the state WARN Act, *In re Jevic Holding Corp.*, 496 B.R. 151, 165 (Bankr. D. Del. 2013).

which $8,300,000 was a priority wage claim under 11 U.S.C. § 507(a)(4). *See* Drivers' Br. 6 & n.3; *In re Powermate Holding Corp.*, 394 B.R. 765, 773 (Bankr. D. Del. 2008) ("Courts have consistently held that WARN Act damages are within 'the nature of wages' for which § 507(a)(4) provides."). The record is not explicit as to why the settlement did not provide for any payment to the Drivers even though they held claims of higher priority than the tax and trade creditors' claims.[3] It seems that the Drivers and the other parties were unable to agree on a settlement of the WARN Act claim, and Sun was unwilling to pay the Drivers as long as the WARN Act lawsuit continued because Sun was a defendant in those proceedings and did not want to fund litigation against itself.[4] The settling parties also accept the

---

[3] For example, Jevic's chief restructuring officer opaquely testified in the Bankruptcy Court: "There was no decision not to pay the WARN claimants. There was a decision to settle certain proceedings amongst parties. The WARN claimants were part of that group of people that decided to create a settlement. So there was no decision not to pay the WARN claimants." App. 1258.

[4] Sun's counsel acknowledged as much in the Bankruptcy Court, stating:

> [I]t doesn't take testimony for Your Honor . . . to figure out, Sun probably does care where the money goes because you can take judicial notice that there's a pending WARN action against Sun by the WARN plaintiffs. And if the money goes to the WARN plaintiffs, then you're funding somebody who is suing you who

Drivers' contention that it was "the paramount interest of the Committee to negotiate a deal under which the [Drivers] were excluded" because a settlement that paid the Drivers' priority claim would have left the Committee's constituents with nothing. Appellees' Br. 26 (quoting Drivers' Br. 28).

B

The Drivers and the United States Trustee objected to the proposed settlement and dismissal mainly because it distributed property of the estate to creditors of lower priority than the Drivers under § 507 of the Bankruptcy Code. The Trustee also objected on the ground that the Code does not permit structured dismissals, while the Drivers further argued that the Committee breached its fiduciary duty to the estate by "agreeing to a settlement that, effectively, freezes out the [Drivers]." App. 30–31 (Bankr. Op. 8–9). The Bankruptcy Court rejected these objections in an oral opinion approving the proposed settlement and dismissal.

The Bankruptcy Court began by recognizing the absence of any "provision in the code for distribution and dismissal contemplated by the settlement motion," but it noted that similar relief has been granted by other courts. App. 31 (Bankr. Op. 9). Summarizing its assessment, the

---

otherwise doesn't have funds and is doing it on a contingent fee basis.

App. 1363; *accord* Appellees' Br. 26. This is the only reason that appears in the record for why the settlement did not provide for either direct payment to the Drivers or the assignment of Sun's lien on Jevic's remaining cash to the estate rather than to a liquidating trust earmarked for everybody but the Drivers.

Court found that "the dire circumstances that are present in this case warrant the relief requested here by the Debtor, the Committee and the secured lenders." *Id.* The Court went on to make findings establishing those dire circumstances. It found that there was "no realistic prospect" of a meaningful distribution to anyone but the secured creditors unless the settlement were approved because the traditional routes out of Chapter 11 bankruptcy were impracticable. App. 32 (Bankr. Op. 10). First, there was "no prospect" of a confirmable Chapter 11 plan of reorganization or liquidation being filed. *Id.* Second, conversion to liquidation under Chapter 7 of the Bankruptcy Code would have been unavailing for any party because a Chapter 7 trustee would not have had sufficient funds "to operate, investigate or litigate" (since all the cash left in the estate was encumbered) and the secured creditors had "stated unequivocally and credibly that they would not do this deal in a Chapter 7." *Id.*

The Bankruptcy Court then rejected the objectors' argument that the settlement could not be approved because it distributed estate assets in violation of the Code's "absolute priority rule." After noting that Chapter 11 plans must comply with the Code's priority scheme, the Court held that settlements need not do so. The Court also disagreed with the Drivers' fiduciary duty argument, dismissing the notion that the Committee's fiduciary duty to the estate gave each creditor veto power over any proposed settlement. The Drivers were never barred from participating in the settlement negotiations, the Court observed, and their omission from the settlement distribution would not prejudice them because their claims against the Jevic estate were "effectively worthless" since the estate lacked any unencumbered funds. App. 36 (Bankr. Op. 14).

11

Finally, the Bankruptcy Court applied the multifactor test of *In re Martin*, 91 F.3d 389 (3d Cir. 1996), for evaluating settlements under Federal Rule of Bankruptcy Procedure 9019. It found that the Committee's likelihood of success in the fraudulent conveyance action was "uncertain at best," given the legal hurdles to recovery, the substantial resources of CIT and Sun, and the scarcity of funds in the estate to finance further litigation. App. 34–35 (Bankr. Op. 12–13). The Court highlighted the complexity of the litigation and expressed its skepticism that new counsel or a Chapter 7 trustee could be retained to continue the fraudulent conveyance suit on a contingent fee basis. App. 35–36 (Bankr. Op. 13–14) ("[O]n these facts I think any lawyer or firm that signed up for that role should have his head examined."). Faced with, in its view, either "a meaningful return or zero," the Court decided that "[t]he paramount interest of the creditors mandates approval of the settlement" and nothing in the Bankruptcy Code dictated otherwise. App. 36 (Bankr. Op. 14). The Bankruptcy Court therefore approved the settlement and dismissed Jevic's Chapter 11 case.

## C

The Drivers appealed to the United States District Court for the District of Delaware and filed a motion in the Bankruptcy Court to stay its order pending appeal. The Bankruptcy Court denied the stay request, and the Drivers did not renew their request for a stay before the District Court. The parties began implementing the settlement months later, distributing over one thousand checks to priority tax creditors and general unsecured creditors.

The District Court subsequently affirmed the Bankruptcy Court's approval of the settlement and dismissal of the case. The Court began by noting that the Drivers

"largely do not contest the bankruptcy court's factual findings." *Jevic Holding Corp.*, 2014 WL 268613, at *2 (D. Del. Jan. 24, 2014). In analyzing those factual findings, the District Court held, the Bankruptcy Court had correctly applied the *Martin* factors and determined that the proposed settlement was "fair and equitable." *Id.* at *2–3. The Court also rejected the Drivers' fiduciary duty and absolute priority rule arguments for the same reasons explained by the bankruptcy judge. *Id.* at *3. And even if the Bankruptcy Court had erred by approving the settlement and dismissing the case, the District Court held in the alternative that the appeal was equitably moot because the settlement had been "substantially consummated as all the funds have been distributed." *Id.* at *4. The Drivers filed this timely appeal, with the United States Trustee supporting them as amicus curiae.

## II

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b), and the District Court had jurisdiction under 28 U.S.C. §§ 158(a) and 1334. We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291.

"Because the District Court sat below as an appellate court, this Court conducts the same review of the Bankruptcy Court's order as did the District Court." *In re Telegroup, Inc.*, 281 F.3d 133, 136 (3d Cir. 2002). We review questions of law de novo, findings of fact for clear error, and exercises of discretion for abuse thereof. *In re Goody's Family Clothing Inc.*, 610 F.3d 812, 816 (3d Cir. 2010).

III

To the extent that the Bankruptcy Court had discretion to approve the structured dismissal at issue, the Drivers tacitly concede that the Court did not abuse that discretion in approving a settlement of the Committee's action against CIT and Sun and dismissing Jevic's Chapter 11 case.

First, Federal Rule of Bankruptcy Procedure 9019 expressly authorizes settlements as long as they are "fair and equitable." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson* (*TMT Trailer Ferry*), 390 U.S. 414, 424 (1968). In *Martin*, we gleaned from *TMT Trailer Ferry* four factors to guide bankruptcy courts in this regard: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." 91 F.3d at 393. None of the objectors contends that the Bankruptcy Court erred in concluding that the balance of these factors favors settlement, and we agree. Although the Committee's fraudulent conveyance suit survived a motion to dismiss, it was far from compelling, especially in view of CIT's and Sun's substantial resources and the Committee's lack thereof. App. 35 (Bankr. Op. 13); *see* App. 1273 (summarizing expert testimony CIT planned to offer that Jevic's failure was caused by systemic economic and industrial problems, not the leveraged buyout); *In re World Health Alts., Inc.*, 344 B.R. 291, 302 (Bankr. D. Del. 2006) ("[S]uccessful challenges to a pre-petition first lien creditor's position are unusual, if not rare."). The litigation promised to be complex and lengthy, whereas the settlement offered most of Jevic's creditors actual distributions.

Nor do the Drivers dispute that the Bankruptcy Court generally followed the law with respect to dismissal. A bankruptcy court may dismiss a Chapter 11 case "for cause," and one form of cause contemplated by the Bankruptcy Code is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation[.]" 11 U.S.C. § 1112(b)(1), (b)(4)(A). By the time the settling parties requested dismissal, the estate was almost entirely depleted and there was no chance of a plan of reorganization being confirmed. But for $1.7 million in encumbered cash and the fraudulent conveyance action, Jevic had nothing.

Instead of challenging the Bankruptcy Court's discretionary judgments as to the propriety of a settlement and dismissal, the Drivers and the United States Trustee argue that the Bankruptcy Court did not have the discretion it purported to exercise. Specifically, they claim bankruptcy courts have no legal authority to approve structured dismissals, at least to the extent they deviate from the priority system of the Bankruptcy Code in distributing estate assets. We disagree and hold that bankruptcy courts may, in rare instances like this one, approve structured dismissals that do not strictly adhere to the Bankruptcy Code's priority scheme.

A

We begin by considering whether structured dismissals are ever permissible under the Bankruptcy Code. The Drivers submit that "Chapter 11 provides debtors only three exits from bankruptcy": confirmation of a plan of reorganization, conversion to Chapter 7 liquidation, or plain dismissal with no strings attached. Drivers' Br. 18. They argue that there is no statutory authority for structured dismissals and that "[t]he Bankruptcy Court admitted as much." *Id.* at 44. They cite a

provision of the Code and accompanying legislative history indicating that Congress understood the ordinary effect of dismissal to be reversion to the status quo ante. *Id.* at 45 (citing 11 U.S.C. § 349(b)(3); H.R. Rep. No. 595, 95th Cong., 1st Sess. 338 (1977)).

The Drivers are correct that, as the Bankruptcy Court acknowledged, the Code does not expressly authorize structured dismissals. *See* App. 31 (Bankr. Op. 9). And as structured dismissals have occurred with increased frequency,[5] even commentators who seem to favor this trend have expressed uncertainty about whether the Code permits them.[6] As we understand them, however, structured dismissals are simply dismissals that are preceded by other orders of the bankruptcy court (*e.g.*, orders approving

---

[5] *See* Norman L. Pernick & G. David Dean, *Structured Chapter 11 Dismissals: A Viable and Growing Alternative After Asset Sales*, Am. Bankr. Inst. J., June 2010, at 1; *see, e.g.*, *In re Kainos Partners Holding Co.*, 2012 WL 6028927 (D. Del. Nov. 30, 2012); *World Health Alts.*, 344 B.R. at 293–95. *But cf. In re Biolitec, Inc.*, 2014 WL 7205395 (Bankr. D.N.J. Dec. 16, 2014) (rejecting a proposed structured dismissal as invalid under the Code).

[6] *See, e.g.*, Brent Weisenberg, *Expediting Chapter 11 Liquidating Debtor's Distribution to Creditors*, Am. Bankr. Inst. J., April 2012, at 36 ("[T]he time is ripe to make crystal clear that these procedures are in fact authorized by the Code."). *But cf.* Nan Roberts Eitel et al., *Structured Dismissals, or Cases Dismissed Outside of Code's Structure?*, Am. Bankr. Inst. J., March 2011, at 20 (article by United States Trustee staff arguing that structured dismissals are improper under the Code).

settlements, granting releases, and so forth) that remain in effect after dismissal. And though § 349 of the Code contemplates that dismissal will typically reinstate the pre-petition state of affairs by revesting property in the debtor and vacating orders and judgments of the bankruptcy court, it also explicitly authorizes the bankruptcy court to alter the effect of dismissal "for cause"—in other words, the Code does not strictly require dismissal of a Chapter 11 case to be a hard reset. 11 U.S.C. § 349(b); H.R. Rep. No. 595 at 338 ("The court is permitted to order a different result for cause."); *see also Matter of Sadler*, 935 F.2d 918, 921 (7th Cir. 1991) ("'Cause' under § 349(b) means an acceptable reason.").

Quoting Justice Scalia's oft-repeated quip "Congress . . . does not, one might say, hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), the Drivers forcefully argue that Congress would have spoken more clearly if it had intended to leave open an end run around the procedures that govern plan confirmation and conversion to Chapter 7, Drivers' Br. 22. According to the Drivers, the position of the District Court, the Bankruptcy Court, and Appellees overestimates the breadth of bankruptcy courts' settlement-approval power under Rule 9019, "render[ing] plan confirmation superfluous" and paving the way for illegitimate *sub rosa* plans engineered by creditors with overwhelming bargaining power. *Id.*; *see also id.* at 24–25. Neither "dire circumstances" nor the bankruptcy courts' general power to carry out the provisions of the Code under 11 U.S.C. § 105(a), the Drivers say, authorizes a court to evade the Code's requirements. *Id.* at 32–35, 40–41.

But even if we accept all that as true, the Drivers have proved only that the Code forbids structured dismissals when they are used to circumvent the plan confirmation process or

17

conversion to Chapter 7. Here, the Drivers mount no real challenge to the Bankruptcy Court's findings that there was no prospect of a confirmable plan in this case and that conversion to Chapter 7 was a bridge to nowhere. So this appeal does not require us to decide whether structured dismissals are permissible when a confirmable plan is in the offing or conversion to Chapter 7 might be worthwhile. For present purposes, it suffices to say that absent a showing that a structured dismissal has been contrived to evade the procedural protections and safeguards of the plan confirmation or conversion processes, a bankruptcy court has discretion to order such a disposition.

## B

Having determined that bankruptcy courts have the power, in appropriate circumstances, to approve structured dismissals, we now consider whether settlements in that context may ever skip a class of objecting creditors in favor of more junior creditors. *See In re Buffet Partners, L.P.*, 2014 WL 3735804, at *4 (Bankr. N.D. Tex. July 28, 2014) (approving a structured dismissal while "emphasiz[ing] that not one party with an economic stake in the case has objected to the dismissal in this manner"). The Drivers' primary argument in this regard is that even if structured dismissals are permissible, they cannot be approved if they distribute estate assets in derogation of the priority scheme of § 507 of the Code. They contend that § 507 applies to all distributions of estate property under Chapter 11, meaning the Bankruptcy Court was powerless to approve a settlement that skipped priority employee creditors in favor of tax and general unsecured creditors. Drivers' Br. 21, 35–36; *see* 11 U.S.C. § 103(a) ("[C]hapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13[.]"); *Law v. Siegel*, 134 S. Ct.

1188, 1194 (2014) ("'[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." (citation omitted)).

The Drivers' argument is not without force. Although we are skeptical that § 103(a) requires settlements in Chapter 11 cases to strictly comply with the § 507 priorities,[7] there is some tacit support in the caselaw for the Drivers' position. For example, in *TMT Trailer Ferry*, the Supreme Court held that the "requirement[] . . . that plans of reorganization be both 'fair and equitable,' appl[ies] to compromises just as to other aspects of reorganizations." 390 U.S. at 424. The Court also noted that "a bankruptcy court is not to approve or confirm a plan of reorganization unless it is found to be 'fair and equitable.' This standard incorporates the absolute priority doctrine under which creditors and stockholders may participate only in accordance with their respective priorities[.]" *Id.* at 441; *see also* 11 U.S.C. § 1129(b)(2)(B)(ii) (codifying the absolute priority rule by requiring that a plan of reorganization pay senior creditors before junior creditors in order to be "fair and equitable" and confirmable). This latter statement comports with a line of cases describing "fair

---

[7] There is nothing in the Code indicating that Congress legislated with settlements in mind—in fact, the bankruptcy courts' power to approve settlements comes from a Federal Rule of Bankruptcy Procedure promulgated by the Supreme Court, not Congress. *See* Rules Enabling Act, 28 U.S.C. § 2075. If § 103(a) meant that all distributions in Chapter 11 cases must comply with the priorities of § 507, there would have been no need for Congress to codify the absolute priority rule specifically in the plan confirmation context. *See* 11 U.S.C. § 1129(b)(2)(B)(ii).

and equitable" as "'words of art' which mean that senior interests are entitled to full priority over junior ones[.]" *SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594, 611 (1965); *accord Otis & Co. v. SEC*, 323 U.S. 624, 634 (1945); *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 115–16 (1939).

Although these cases provide some support to the Drivers, they are not dispositive because each of them spoke in the context of plans of reorganization, not settlements. *See, e.g.*, *TMT Trailer Ferry*, 424 U.S. at 441; *Am. Trailer Rentals*, 379 U.S. at 611; *see also In re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005) (applying the absolute priority rule to deny confirmation of a proposed plan). When Congress codified the absolute priority rule discussed in the line of Supreme Court decisions cited above, it did so in the specific context of plan confirmation, *see* § 1129(b)(2)(B)(ii), and neither Congress nor the Supreme Court has ever said that the rule applies to settlements in bankruptcy. Indeed, the Drivers themselves admit that the absolute priority rule "plainly does not apply here," even as they insist that the legal principle embodied by the rule dictates a result in their favor. Drivers' Br. 37.

Two of our sister courts have grappled with whether the priority scheme of § 507 must be followed when settlement proceeds are distributed in Chapter 11 cases. In *Matter of AWECO, Inc.*, the Court of Appeals for the Fifth Circuit rejected a settlement of a lawsuit against a Chapter 11 debtor that would have transferred $5.3 million in estate assets to an unsecured creditor despite the existence of outstanding senior claims. 725 F.2d 293, 295–96 (1984). The Court held that the "fair and equitable" standard applies to settlements, and "fair and equitable" means compliant with the priority system. *Id.* at 298.

Criticizing the Fifth Circuit's rule in *AWECO*, the Second Circuit adopted a more flexible approach in *In re Iridium Operating LLC*, 478 F.3d 452 (2007). There, the unsecured creditors' committee sought to settle a suit it had brought on the estate's behalf against a group of secured lenders; the proposed settlement split the estate's cash between the lenders and a litigation trust set up to fund a different debtor action against Motorola, a priority administrative creditor. *Id.* at 456, 459–60. Motorola objected to the settlement on the ground that the distribution violated the Code's priority system by skipping Motorola and distributing funds to lower-priority creditors. *Id.* at 456. Rejecting the approach taken by the Fifth Circuit in *AWECO* as "too rigid," the Second Circuit held that the absolute priority rule "is not necessarily implicated" when "a settlement is presented for court approval apart from a reorganization plan[.]" *Id.* at 463–64. The Court held that "whether a particular settlement's distribution scheme complies with the Code's priority scheme must be the most important factor for the bankruptcy court to consider when determining whether a settlement is 'fair and equitable' under Rule 9019," but a noncompliant settlement could be approved when "the remaining factors weigh heavily in favor of approving a settlement[.]" *Id.* at 464.

Applying its holding to the facts of the case, the Second Circuit noted that the settlement at issue deviated from the Code priorities in two respects: first, by skipping Motorola in distributing estate assets to the litigation fund created to finance the unsecured creditors committee's suit against Motorola; and second, by skipping Motorola again in providing that any money remaining in the fund after the litigation concluded would go straight to the unsecured creditors. 478 F.3d at 459, 465–66. The Court indicated that

the first deviation was acceptable even though it skipped Motorola:

> It is clear from the record why the Settlement distributes money from the Estate to the [litigation vehicle]. The alternative to settling with the Lenders—pursuing the challenge to the Lenders' liens—presented too much risk for the Estate, including the administrative creditors. If the Estate lost against the Lenders (after years of litigation and paying legal fees), the Estate would be devastated, all its cash and remaining assets liquidated, and the Lenders would still possess a lien over the Motorola Estate Action. Similarly, administrative creditors would not be paid if the Estate was unsuccessful against the Lenders. Further, as noted at the Settlement hearing, having a well-funded litigation trust was preferable to attempting to procure contingent fee-based representation.

*Id.* at 465–66. But because the record did not adequately explain the second deviation, the Court remanded the case to allow the bankruptcy court to consider that issue. *Id.* at 466 ("[N]o reason has been offered to explain why any balance left in the litigation trust could not or should not be distributed pursuant to the rule of priorities.").

We agree with the Second Circuit's approach in *Iridium*—which, we note, the Drivers and the United States Trustee cite throughout their briefs and never quarrel with. *See* Drivers' Br. 27, 36; Reply Br. 11–13; Trustee Br. 21. As in other areas of the law, settlements are favored in bankruptcy. *In re Nutraquest*, 434 F.3d 639, 644 (3d Cir. 2006). "Indeed, it is an unusual case in which there is not

22

some litigation that is settled between the representative of the estate and an adverse party." *Martin*, 91 F.3d at 393. Given the "dynamic status of some pre-plan bankruptcy settlements," *Iridium*, 478 F.3d at 464, it would make sense for the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to leave bankruptcy courts more flexibility in approving settlements than in confirming plans of reorganization. For instance, if a settlement is proposed during the early stages of a Chapter 11 bankruptcy, the "nature and extent of the [e]state and the claims against it" may be unresolved. *Id.* at 464. The inquiry outlined in *Iridium* better accounts for these concerns, we think, than does the per se rule of *AWECO*.

At the same time, we agree with the Second Circuit's statement that compliance with the Code priorities will usually be dispositive of whether a proposed settlement is fair and equitable. *Id.* at 455. Settlements that skip objecting creditors in distributing estate assets raise justifiable concerns about collusion among debtors, creditors, and their attorneys and other professionals. *See id.* at 464. Although Appellees have persuaded us to hold that the Code and the Rules do not extend the absolute priority rule to settlements in bankruptcy, we think that the policy underlying that rule—ensuring the evenhanded and predictable treatment of creditors—applies in the settlement context. As the Drivers note, nothing in the Code or the Rules obliges a creditor to cut a deal in order to receive a distribution of estate assets to which he is entitled. Drivers' Br. 42–43. If the "fair and equitable" standard is to have any teeth, it must mean that bankruptcy courts cannot approve settlements and structured dismissals devised by certain creditors in order to increase their shares of the estate at the expense of other creditors. We therefore hold that bankruptcy courts may approve settlements that deviate from

the priority scheme of § 507 of the Bankruptcy Code only if they have "specific and credible grounds to justify [the] deviation." *Iridium*, 478 F.3d at 466.

C

We admit that it is a close call, but in view of the foregoing, we conclude that the Bankruptcy Court had sufficient reason to approve the settlement and structured dismissal of Jevic's Chapter 11 case. This disposition, unsatisfying as it was, remained the least bad alternative since there was "no prospect" of a plan being confirmed and conversion to Chapter 7 would have resulted in the secured creditors taking all that remained of the estate in "short order." App. 32 (Bankr. Op. 10).

Our dissenting colleague's contrary view rests on the counterfactual premise that the parties could have reached an agreeable settlement that conformed to the Code priorities. He would have us make a finding of fact to that effect and order the Bankruptcy Court to redesign the settlement to comply with § 507. We decline to do so because, even if it were appropriate for us to review findings of fact de novo and equitably reform settlements on appeal, there is no evidence calling into question the Bankruptcy Court's conclusion that there was "no realistic prospect" of a meaningful distribution to Jevic's unsecured creditors apart from the settlement under review. App. 32 (Bankr. Op. 10). If courts required settlements to be perfect, they would seldom be approved; though it's regrettable that the Drivers were left out of this one, the question—as Judge Scirica recognizes—is whether the settlement serves the interests of the estate, not one particular group of creditors. There is no support in the record for the proposition that a viable alternative existed that would have better served the estate and the creditors as a whole.

The distribution of Jevic's remaining $1.7 million to all creditors but the Drivers was permissible for essentially the same reasons that the initial distribution of estate assets to the litigation fund was allowed by the Second Circuit in *Iridium*.[8] As in that case, here the Bankruptcy Court had to choose between approving a settlement that deviated from the priority scheme of § 507 or rejecting it so a lawsuit could proceed to deplete the estate. Although we are troubled by the fact that the exclusion of the Drivers certainly lends an element of unfairness to the first option, the second option would have served the interests of neither the creditors nor the estate. The Bankruptcy Court, in Solomonic fashion, reluctantly approved the only course that resulted in some payment to creditors other than CIT and Sun.

*    *    *

Counsel for the United States Trustee told the Bankruptcy Court that it is immaterial whether there is a viable alternative to a structured dismissal that does not

---

[8] Judge Scirica reads *Iridium* as involving a settlement that deviated from the § 507 priority scheme in just one respect, and a minor one at that. As we have explained, however, the *Iridium* settlement involved two deviations: (1) the initial distribution of estate funds to the litigation fund created to sue Motorola; and (2) the contingent provision that money left in the fund after the litigation concluded would go directly to the unsecured creditors. *See supra* Section III-B. The Second Circuit held that, while the second deviation needed to be explained on remand, the first was acceptable despite the fact that it impaired Motorola because it clearly served the interests of the estate. *See Iridium*, 478 F.3d at 465–66.

comply with the Bankruptcy Code's priority scheme. "[W]e have to accept the fact that we are sometimes going to get a really ugly result, an economically ugly result, but it's an economically ugly result that is dictated by the provisions of the code," he said. App. 1327. We doubt that our national bankruptcy policy is quite so nihilistic and distrustful of bankruptcy judges. Rather, we believe the Code permits a structured dismissal, even one that deviates from the § 507 priorities, when a bankruptcy judge makes sound findings of fact that the traditional routes out of Chapter 11 are unavailable and the settlement is the best feasible way of serving the interests of the estate and its creditors. Although this result is likely to be justified only rarely, in this case the Bankruptcy Court provided sufficient reasons to support its approval of the settlement under Rule 9019. For that reason, we will affirm the order of the District Court.

**SCIRICA**, *Circuit Judge*

I concur in parts of the Court's analysis in this difficult case, but I respectfully dissent from the decision to affirm. Rejection of the settlement was called for under the Bankruptcy Code and, by approving the settlement, the bankruptcy court's order undermined the Code's essential priority scheme. Accordingly, I would vacate the bankruptcy court's order and remand for further proceedings, described below.

At the outset, I should state that this is not a case where equitable mootness applies. We recently made clear in *In re Semcrude, L.P.*, 728 F.3d 314 (3d Cir. 2013), that this doctrine applies only where there is a confirmed plan of reorganization. I would also adopt the Second Circuit's standard from *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007), and hold that settlements presented outside of plan confirmations must, absent extraordinary circumstances, comply with the Code's priority scheme.

Where I depart from the majority opinion, however, is in holding this appeal presents an extraordinary case where departure from the general rule is warranted. The bankruptcy court believed that because no confirmable Chapter 11 plan was possible, and because the only alternative to the settlement was a Chapter 7 liquidation in which the WARN Plaintiffs would have received no recovery, compliance with the Code's priority scheme was not required. For two reasons, however, I respectfully dissent.

First, it is not clear to me that the only alternative to the settlement was a Chapter 7 liquidation. An alternative settlement might have been reached in Chapter 11, and might have included the WARN Plaintiffs. The reason that such a settlement was not reached was that one of the defendants being released (Sun) did not want to fund the WARN Plaintiffs in their ongoing litigation against it. As Sun's counsel explained at the settlement hearing, "if the money goes to the WARN plaintiffs, then you're funding someone who is suing you who otherwise doesn't have funds and is doing it on a contingent fee basis." Sun therefore insisted that, as a condition to participating in the fraudulent conveyance action settlement, the WARN Plaintiffs would have to drop their WARN claims. Accordingly, to the extent that the only alternative to the settlement was a Chapter 7 liquidation, that reality was, at least in part, a product of appellees' own making.

More fundamentally, I find the settlement at odds with the goals of the Bankruptcy Code. One of the Code's core goals is to maximize the value of the bankruptcy estate, *see Toibb v. Radloff*, 501 U.S. 157, 163 (1991), and it is the duty of a bankruptcy trustee or debtor-in-possession to work toward that goal, including by prosecuting estate causes of action,[1] *see Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352 (1985); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). The reason creditors'

---

[1]    Of course, it was the creditors' committee, rather than a bankruptcy trustee or debtor-in-possession, who was responsible for prosecuting the fraudulent conveyance action here.

committees may bring fraudulent conveyance actions on behalf of the estate is that such committees are likely to maximize estate value; "[t]he possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions [by a debtor-in-possession]." *Cybergenics*, 330 F.3d at 573. The settlement of estate causes of action can, and often does, play a crucial role in maximizing estate value, as settlements may save the estate the time, expense, and uncertainties associated with litigation. *See Protective Comm. for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) ("In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts."); *In re A&C Props.*, 784 F.2d 1377, 1380-81 (9th Cir. 1986) ("The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims."). Thus, to the extent that a settlement's departure from the Code's priority scheme was necessary to maximize the estate's overall value, I would not object.

But here, it is difficult to see how the settlement is directed at estate-value maximization. Rather, the settlement deviates from the Code's priority scheme so as to maximize the recovery that certain creditors receive, some of whom (the unsecured creditors) would not have been entitled to recover anything in advance of the WARN Plaintiffs had the estate property been liquidated and distributed in Chapter 7 proceedings or under a Chapter 11 "cramdown." There is, of course, a substantial difference between the estate itself and specific estate constituents. The estate is a distinct legal

3

entity, and, in general, its assets may not be distributed to creditors except in accordance with the strictures of the Bankruptcy Code.[2]

In this sense, then, the settlement and structured dismissal raise the same concern as transactions invalidated under the *sub rosa* plan doctrine. In *In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir. 1983), the Court of Appeals for the Fifth Circuit rejected an asset sale that "had the practical effect of dictating some of the terms of any future reorganization plan." *Id.* at 940. The sale was impermissible because the transaction "short circuit[ed] the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *Id.* "When a proposed transaction specifies terms for adopting a reorganization plan, 'the parties and the district court must scale the hurdles erected in Chapter 11.'"

---

[2] This point is reinforced with an analogy to trust law. Where there are two or more beneficiaries of a trust, the trustee is under a duty to deal with them impartially, and cannot take an action that rewards certain beneficiaries while harming others. Restatement (Second) of Trusts § 183 (1959); *see also Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996) ("The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries."). Yet that is what the Committee did here. This duty persists even where the trustee is a beneficiary of the trust himself, like the creditors' committee was here. *See* Restatement (Third) of Trusts § 32 (2003) ("A natural person, including a settlor or beneficiary, has capacity . . . to administer trust property and act as trustee . . . .")

*In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) (quoting *Braniff*, 700 F.2d at 940). Although the combination of the settlement and structured dismissal here does not, strictly speaking, constitute a *sub rosa* plan — the hallmark of such a plan is that it dictates the terms of a reorganization plan, and the settlement here does not do so — the broader concerns underlying the *sub rosa* doctrine are at play. The settlement reallocated assets of the estate in a way that would not have been possible without the authority conferred upon the creditors' committee by Chapter 11 and effectively terminated the Chapter 11 case, but it failed to observe Chapter 11's "safeguards of disclosure, voting, acceptance, and confirmation." *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1982); *see also In re Biolitec Inc.*, No. 13-11157, 2014 WL 7205395, at *8 (Bankr. D.N.J. Dec. 17, 2014) (rejecting settlement and structured dismissal that assigned rights and interests but did not allow parties to vote on settlement's provisions in part because it "resemble[d] an impermissible *sub rosa* plan"). This settlement then appears to constitute an impermissible end-run around the carefully designed routes by which a debtor may emerge from Chapter 11 proceedings.

Critical to this analysis is the fact that the money paid by the secured creditors in the settlement was property of the estate. A cause of action held by the debtor is property of the estate, *see Bd. of Trs. of Teamsters Local 863 v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002), and "proceeds . . . of or from property of the estate" are considered estate property as well, 11 U.S.C. § 541(a)(6). Here, the administrative and unsecured creditors received the $3.7 million as consideration for the releases from the fraudulent conveyance action, so this payment qualifies as "proceeds" from the estate's cause of

action.[3] *See* Black's Law Dictionary 1325 (9th ed. 2009) (defining proceeds as "[s]omething received upon selling, exchanging, collecting, or otherwise disposing of collateral"); *see also Strauss v. Morn*, Nos. 97-16481 & 97-16483, 1998 WL 546957, at *3 (9th Cir. 1998) ("§ 541(a)(6) mandates the broad interpretation of the term 'proceeds' to encompass all proceeds of property of the estate"); *In re Rossmiller*, No. 95-1249, 1996 WL 175369, at *2 (10th Cir. 1996) (similar). This case is thus distinguishable from the so-called "gifting" cases such as *In re World Health Alternatives*, 344 B.R. 291 (Bankr. D. Del. 2006), and *In re SPM Manufacturing Corp.*, 984 F.2d 1305 (1st Cir. 1993). In fact, those courts explicitly distinguished estate from non-estate property, and approved the class-skipping arrangements only because the proceeds being distributed were *not* estate property. *See World Health*, 344 B.R. at 299-300; *SPM*, 984 F.3d at 1313. The arrangement here is closer to a § 363 asset sale where the proceeds from the debtor's assets are distributed directly to certain creditors, rather than the bankruptcy estate. *Cf. In re Chrysler LLC*, 576 F.3d 108, 118 (2d Cir. 2009) (noting, in upholding a § 363 sale, that the bankruptcy court

---

[3]      On June 30, 2006, Sun acquired Jevic in a leveraged buyout, which included an $85 million revolving credit facility from a bank group led by CIT. The fraudulent conveyance action complaint sets forth that Jevic and Sun allegedly knew that Jevic would default on the CIT financing agreement by September 11 of that year. The fraudulent conveyance action sought over $100 million in damages, and the unsecured creditors' committee alleged that "[w]ith CIT's active assistance . . . Sun orchestrated a[n] . . . LBO whereby Debtors' assets were leveraged to enable a Sun affiliate to pay $77.4 million . . . with no money down."

demonstrated "proper solicitude for the priority between creditors and deemed it essential that the [s]ale in no way upset that priority"), *vacated as moot*, 592 F.3d 370. It is doubtful that such an arrangement would be permissible.

The majority likens the deviation in this case to the first deviation in *Iridium*, in which the settlement would initially distribute funds to the litigation trust instead of the Motorola administrative creditors. For two reasons, however, I find this analogy unavailing. First, it is not clear to me that the Second Circuit saw the settlement's initial distribution of funds to the litigation trust as a deviation from the Code's priority scheme at all. As the Second Circuit explained, if the litigation was successful, the majority of the proceeds from that litigation would actually flow back to the estate, then to be distributed in accordance with the Code's priority scheme. 459 F.3d at 462.[4] Second, the critical (and, in my view, determinative) characteristic of the settlement in this case is that it skips over an entire class of creditors. That is precisely what the second "deviation" in *Iridium* did, and the Second Circuit remanded to the bankruptcy court for further consideration of that aspect of the settlement.

In fact, the second "deviation" in *Iridium* deviated from the priority scheme in a more minor way than the settlement at issue here. In *Iridium*, the settlement would have deviated from the priority scheme only in the event that Motorola, an administrative creditor and a defendant in various litigation matters brought by the creditors' committee, had prevailed in the litigation or if its administrative claims

---

[4]     Here, by contrast, none of the settlement proceeds flowed to the estate.

had exceeded its liability in the litigation. *Iridium*, 478 F.3d at 465. The Second Circuit thus characterized this aspect of the settlement as a mere "possible deviation" in "one regard," but nevertheless remanded for the bankruptcy court to assess the "possible" deviation's justification. *Id.* at 466. Here, of course, it is clear that the settlement deviates from the priority scheme, as it provides no compensation for an entire class of priority creditors, while providing $1.7 million to the general unsecured creditors.

Finally, I do not question the factual findings made by the bankruptcy court. That court found that there was "no realistic prospect" of a meaningful distribution to Jevic's unsecured creditors apart from the settlement under review. But whether there was a realistic prospect of distribution to the unsecured creditors in the absence of this settlement is not relevant to my concerns. What matters is whether the settlement's deviation from the priority scheme was necessary to maximize the value of the *estate*. There is a difference between the estate and certain creditors of the estate, and there has been no suggestion that the deviation maximized the value of the estate itself.

The able bankruptcy court here was faced with an unpalatable set of alternatives. But I do not believe the situation it faced was entirely *sui generis*. It is not unusual for a debtor to enter bankruptcy with liens on all of its assets, nor is it unusual for a debtor to enter Chapter 11 proceedings — the flexibility of which enabled appellees to craft this settlement in the first place — with the goal of liquidating,

rather than rehabilitating, the debtor.[5] It is also not difficult to imagine another secured creditor who wants to avoid providing funds to priority unsecured creditors, particularly where the secured creditor is also the debtor's ultimate parent and may have obligations to the debtor's employees. Accordingly, approval of the bankruptcy court's ruling in this case would appear to undermine the general prohibition on settlements that deviate from the Code's priority scheme.

I recognize that if the settlement were unwound, this case would likely be converted to a Chapter 7 liquidation in

---

[5]    *See* Ralph Brubaker, *The Post-*RadLAX *Ghosts of* Pacific Lumber *and* Philly News *(Part II): Limiting Credit Bidding*, Bankr. L. Letter, July 2014, at 4 (describing the "ascendancy of secured credit in Chapter 11 debtors' capital structures, such that it is now common that a dominant secured lender has blanket liens on substantially all of the debtor's assets securing debts vastly exceeding the value of the debtor's business and assets"); Kenneth M. Ayotte & Edward R. Morrison, *Creditor Control & Conflict in Chapter 11*, 1 J.L. Analysis 511, 519 (2009) (finding that secured claims exceeded the value of the company in twenty-two percent of the bankruptcies surveyed); Stephen J. Lubben, *Business Liquidation*, 81 Am. Bankr. L.J. 65 (2007) (noting that although "chapter 7 is the prevailing method of business liquidation, . . . a sizable number of firms first attempt either a reorganization or liquidation under chapter 11"); 11 U.S.C. § 1123(b)(4) (providing that a chapter 11 plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests").

which the secured creditors would be the only creditors to recover. Accordingly, I would not unwind the settlement entirely. Instead, I would permit the secured creditors to retain the releases for which they bargained and would not disturb any of the proceeds received by the administrative creditors either. But I would also require the bankruptcy court to determine the WARN Plaintiffs' damages under the New Jersey WARN Act, as well as the proportion of those damages that qualifies for the wage priority.[6] I would then have the court order any proceeds that were distributed to creditors with a priority lower than that of the WARN Plaintiffs disgorged, and apply those proceeds to the WARN Plaintiffs' wage priority claim. To the extent that funds are left over, I would have the court redistribute them to the remaining creditors in accordance with the Code's priority scheme.

---

[6]    At this point, the WARN litigation has largely concluded, with the WARN Plaintiffs having established liability on their New Jersey WARN claims against Jevic but having lost on all other claims. On May 10, 2013, the bankruptcy court dismissed the WARN Plaintiffs' claims against Sun (but not Jevic) on the grounds that Sun was not a "single employer" for purposes of the WARN Acts. The district court affirmed that decision on September 29, 2014. *In re Jevic Holding Corp.*, No. 13-1127-SLR, 2014 WL 4949474 (D. Del. Sept. 29, 2014). In a separate opinion on May 10, 2013, the bankruptcy court dismissed the federal WARN Act claims against Jevic, but granted summary judgment in favor of the WARN Plaintiffs against Jevic on their New Jersey WARN Act claims. No appeal was taken of that ruling; in fact, Jevic did not contest liability on the New Jersey WARN Act claims.